UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TCP PRINTING CO., LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:15-CV-178 JAR |
| | ) |
| ENTERPRISE BANK & TRUST, | ) |
| | ) |
| Defendant. | ) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

This matter came before the Court on April 24 and 25, 2017 for a bench trial on Plaintiff TCP Printing Co., LLC ("TCP")'s complaint against Defendant Enterprise Bank & Trust ("Enterprise") for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), conversion (Count III), and alternative claim for unjust enrichment (Count IV) (Doc. No. 1); and Enterprise's motion for summary judgment (Doc. Nos. 38, 48). Evidence was adduced and concluded.[1] A transcript was prepared and the parties submitted proposed findings of fact and conclusions of law. Having considered the pleadings, trial and deposition testimony, exhibits, and proposed findings of fact and conclusions of law submitted by the parties, the Court hereby makes and enters the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

---

[1] TCP did not offer any exhibits into evidence during the presentation of its case or during Enterprise's case; only after Enterprise rested its case did TCP seek to introduce its exhibits. Over Enterprise's objection, the Court allowed TCP to submit a list of exhibits for admission into evidence. Upon consideration of TCP's exhibit list, the Court sustained Enterprise's objection to several TCP exhibits which were neither referenced nor identified at trial (Plaintiff's Exhibits K4, P-32, P-39, P-60, P-76, P-114, P-115, P-117, P-125, P-163). Enterprise had no objection to TCP Exhibits P-10, P-34, P-99, P-103, P-107, P-126, P-137, P-167, P-182, and P-183, and those exhibits were admitted into evidence. (Doc. No. 83). The Court has incorporated Enterprise's remaining objections to TCP's exhibits based on hearsay and lack of foundation into its consideration of the evidence.

# FINDINGS OF FACT

1. At all times relevant to this action, Plaintiff TCP Printing Co., LLC ("TCP"), a Pennsylvania limited liability company, was a commercial printing company, whose sole member was Greg Bozzi ("Bozzi").

2. JPB Investments VI LLC ("JPB"), was a commercial printing and direct mail business located in Missouri, doing business as 601 Direct LLC ("601 Direct"). Paul Behrens ("Behrens") was the sole owner and President of JPB.

3. Defendant Enterprise Bank & Trust ("Enterprise") is a Missouri chartered trust company with banking powers, and at all relevant times was JPB's senior lender holding a first priority security interest in all of JPB's collateral, namely 601 Direct inventory, equipment and accounts receivable.

4. By February 2014, JPB was in financial distress, having already defaulted on three loans extended by Enterprise, and owed Enterprise over $1.9 million.

5. Having acquired printing companies in the past as a way to grow his core business, Bozzi approached Behrens in March 2014 about purchasing JPB's assets, namely its equipment and customer base. It was Bozzi's testimony that TCP was only interested in JPB's equipment and customer base and had no intention of purchasing and running 601 Direct. (Transcript of Proceedings on April 24, 2017 ("Tr. 1"), Doc. No. 85 at 18:16-21; 21:18-22:3; 75:23-76:1).

6. Between March and May 2014, TCP, Enterprise, and JBP met several times to discuss 601 Direct's operations, tour the 601 Direct facility, and identify certain 601 Direct inventory and equipment. (Tr. 1 at 23:25-24:2). Bozzi testified that because TCP was not buying 601 Direct, he thought, as he had in past acquisitions of printing companies, that operating the

business for a certain period of time would give TCP insight into the staffing and equipment necessary to support 601 Direct's customer base. According to Bozzi, TCP wanted to keep JPB running and continue processing orders in order to earn the work for existing customers (Tr. 1 at 25:3-26:6)

7. TCP and JBP were unable to come to terms on an operating agreement or asset purchase agreement. (Tr. 1 at 27:23-28:12) Bozzi never purchased any assets of 601 Direct. (Tr. 1 at 78:11-15). However, according to Bozzi, by May 9, 2014, TCP was providing the funding and working capital necessary to keep 601 Direct from shutting down. (Tr. 1 at 26:14-25)

8. Enterprise was aware that TCP had some involvement in JPB's operations, but assumed TCP was just providing "working capital" until it could purchase some or all of JPB's assets. (Tr. 1 at 143-144)

9. On May 22, 2014, JPB, Enterprise, and TCP entered into an Agreement Relating to Collateral ("the Collateral Agreement") (Ex. P-10) to facilitate TCP's purchase of JPB's assets, and specifically its equipment.

10. The parties agree the Collateral Agreement was unambiguous. By its terms, the proceeds of all JPB inventory, accounts receivable and work in progress identified on a schedule attached to the Collateral Agreement as Exhibit A would be paid to Enterprise and applied to the outstanding loan balance. (Id. at ¶¶ 4, 5).

11. Paragraph 3 of the Collateral Agreement provided that "[a]ll of the inventory listed on Exhibit A will be segregated and identified separately from all inventory purchased through funds provided by TCP." (Id. at ¶ 3).

12. Paragraph 6 of the Collateral Agreement provided that any proceeds from post-closing work funded by TCP and not listed on Exhibit A would be outside the scope of Enterprise's lien, and belong to TCP:

> **Lender's Release of Lien Regarding Inventory and Work-in Progress Funded by TCP**. Lender agrees to not assert its lien, security interest or any claim regarding the Borrower's Inventory and Work-in-Progress that is funded by TCP and is not listed on Exhibit A thereto.

(Id. at ¶ 6).

13. The Collateral Agreement does not define "Work-in-Progress that is funded by TCP," i.e., "TCP-funded work."

14. Paragraph 7 of the Collateral Agreement, **Equipment Purchase and Release of Lien**, provided that TCP would purchase from JPB, for $885,800.00 (Equipment Purchase Price), such of JPB's equipment as was listed on a schedule attached to the Collateral Agreement as Exhibit B. (Id. at ¶ 7).

15. Under Paragraph 8 of the Collateral Agreement, **Expiration Date**, in the event TCP failed to receive a commitment letter from its bank in an amount greater than or equal to the Equipment Purchase Price on or before May 30, 2014, then TCP would be obligated to "immediately vacate [JPB]'s premises and all of TCP's rights under this Agreement with regard to the property listed on Exhibits A and B hereto shall cease and terminate." (Id. at ¶ 8).

16. Under Paragraph 16 of the Collateral Agreement, **Collateral**, the parties agreed that upon the Expiration Date, Enterprise could dispose of all of JPB's collateral (including all accounts receivable). (Id. at ¶ 16(b)).

17. The Collateral Agreement further provided at Paragraph 17 that TCP's failure to "pay any amounts due hereunder on the date on which such amounts are due" shall constitute an "Event of Default." (Id. at ¶ 17).

18. TCP failed to obtain a commitment letter from its bank for the Equipment Purchase Price on or before May 30, 2014. TCP's only contract with Enterprise expired on May 30, 2014.

19. TCP's failure to obtain a commitment letter by May 30, 2014, was an "Event of Default" under the Collateral Agreement.

20. On June 2, 2014, Enterprise invoked its right under the Collateral Agreement to demand that TCP vacate JPB's premises.

21. David Allen, Regional Senior Lender with Enterprise, testified that once TCP defaulted and the Collateral Agreement expired, JPB self-liquidated its assets by selling its own equipment and inventory and collecting its accounts receivable, the proceeds of which were deposited in its cash collateral account with Enterprise. (Tr. 1 at 102:11-15; 120:3-17). JPB continued to do business as 601 Direct until it ceased operations in August 2014.

22. TCP claims that during May 2014, it funded and performed work for JPB's customers that generated receivables of approximately $370,000.00.

23. In support of its claim, TCP submitted invoices for approximately $125,000 worth of work that it billed to 601 Direct customers directly in May 2014. The invoices reference 601 Direct purchase orders and 601 Direct salespersons and describe work performed at 601 Direct with its equipment and employees. (Exs. P-70-75, 78-83, 89, 91, 94-95). Bozzi testified that TCP invoiced these customers out of its Pittsburgh office to protect its funded work and to keep it separate from 601 Direct receivables. (Tr. 1 at 48:19-49:1). Whereas Behrens testified it was typical for 601 Direct to get purchase orders from its larger clients (Tr. 2 at 57:4-6), TCP admittedly had no purchase orders or letters of confirmation from these customers as to each of these invoices. (Tr. 1 at 49:21-50:13).

24. TCP further claims that in addition to the $125,000 in invoiced work, it billed $81,000 and $171,000 to American Direct Marketing Resources ("ADMR"), one of 601 Direct's largest accounts, for work it funded and completed in May 2014.

25. According to Bozzi, ADMR emailed TCP on May 15, 2014 with a production concern which TCP then addressed by providing all of the necessary working capital to complete the work, adding an extra shift, and running on a Saturday in order to meet the delivery requirement. (Tr. 1 at 42:22-43:3). TCP did not ask 601 Direct for approval to complete the order. (Id. at 43:4-7). TCP submitted internal bank communications, including emails and handwritten notes, as evidence of Enterprise's awareness that TCP had provided funding in these amounts. (Exs. P-104, P-117, P-111).

26. Devin Struttman, ADMR's Manager of Production Services, testified by video deposition that he did not recall any conversations or meetings with Bozzi to address production concerns in May 2014.

27. After TCP vacated JPB's premises in June 2014, 601 Direct reinvoiced its customers, taking the position that the TCP invoices were generated for work produced by 601 Direct. (Transcript of Proceedings on April 25, 2017 (morning session) (Tr. 2), Doc. No. 86 at 75:22-25). According to Behrens, JPB's customers were not going to pay TCP because they did not recognize the TCP invoicing and had not contracted with TCP. (Id. at 75:7-22; 93:20-24).

28. Likewise, Struttman testified that ADMR was initially invoiced by TCP (Ex. P-89) and then received similar, if not identical, invoices from 601 Direct. Struttman instructed ADMR's accounting department to pay the 601 Direct invoices because there was no vendor agreement between ADMR and TCP, and because the purchase order had been placed with 601 Direct and the work done at 601 Direct's plant. An ADMR payment history report shows a 601

Direct invoice for $87,402.61 paid on June 13, 2014 and additional 601 Direct invoices totaling $171,430.54 paid on June 20, 2014. (Ex. P-183).

29. Enterprise was aware that there had been some reinvoicing, but considered this an issue between TCP and JPB. (Tr. 1 at 124:3-6; 125:3-6: 138:25; 174:17-175:13; 197:2-20).

30. During the relevant period, Enterprise monitored the balance of JPB's cash collateral account and swept it to apply to JPB's outstanding loan balance. (Tr. 1 at 120:13-17). Enterprise did not trace the source of the individual deposits into its account or reconcile them with the accounts receivable identified on Exhibit A of the Collateral Agreement, having taken the position that any requirement to do so under the Collateral Agreement had expired, and that to the extent TCP did not receive proceeds of its funded work, this was an issue between TCP and JPB. (Tr. 1 at 119:17-18; 121:11; 122:17-19; 155:4-7; 173:17-20).

31. Nicholas Bozzi, TCP's damages expert and Greg Bozzi's father, was asked to analyze cash receipts deposited in JPB's bank account with Enterprise for the period May 22, 2014 to August 1, 2014, in order to determine amounts attributable to TCP-funded work, and also to opine on the losses sustained by TCP as a result of its inability to collect those amounts. (Tr. Vol 2 at 4:3-6; Bozzi Expert Report, P-11; Bozzi Supplemental Expert Report, P-14). He testified that by reviewing 601 Direct bank statements and deposit tickets, as well as accounts receivable ledgers, he was able to identify approximately $525,000 in total cash receipts for all receivables deposited in JPB's account with Enterprise for the period May 22, 2014 to August 1, 2014. By deducting the $156,000 that had been collected on JPB receivables as of August 1, 2014, Nicholas Bozzi identified $370,000 in excess funds which he opines could only have come from TCP-funded work. (Bozzi Supplemental Expert Report, P-14). Nicholas Bozzi further

opined that TCP was significantly affected by its inability to collect the proceeds of its funded work and ultimately lost its going concern status. (Bozzi Expert Report, P-11; Tr.2 42:21-47:23).

32. David Allen with Enterprise testified that as a result of TCP's default under the Collateral Agreement, Enterprise wrote off in excess of $500,000 on JPB's loans and incurred an additional $100,000-$150,000 in rent, utilities, payroll, additional inventory to complete jobs during the extended liquidation period. (Tr. 1 at 202:16-204:6).

33. TCP asserts that Enterprise breached the Collateral Agreement by misappropriating proceeds of TCP-funded work that was not listed on Exhibit A to the Collateral Agreement, resulting in losses of $370,000, plus accrued interest and profits lost as a consequence of being forced to shut down its operations. Related to the breach of contract claim is TCP's claim that Enterprise breached the implied covenant of good faith and fair dealing. TCP further alleges that Enterprise took possession of all proceeds from TCP-funded work, deposited them in its cash collateral account and applied them to JBP's outstanding loan balance, thereby depriving TCP of the right to possession. Alternatively, TCP alleges Enterprise was unjustly enriched by the receipt of a benefit in the amount of $370,000 in proceeds from TCP-funded work and was enriched by that benefit at the expense of TCP when it applied those proceeds toward payment of JPB's loans.

34. Enterprise moved for summary judgment on the grounds that the Collateral Agreement (and corresponding duty of good faith and fair dealing) expired upon TCP's material breach thereof; the proceeds alleged converted is not specific chattel; and its unjust enrichment claim fails because there is a contract between the parties concerning the transaction. The Court took the motion with the case. (Doc. No. 48).

## CONCLUSIONS OF LAW

**Contract claims (Counts I and II)**

35. TCP asserts that Enterprise breached the Collateral Agreement, and specifically Paragraph 6, by misappropriating proceeds of TCP-funded work that was not listed on Exhibit A to the Collateral Agreement, resulting in losses in the amount of $370,000, plus accrued interest and profits lost as a consequence of being forced to shut down its operations. Related to the breach of contract claim is TCP's claim that Enterprise breached the implied covenant of good faith and fair dealing.

36. To state a claim for breach of contract, a plaintiff "must establish the existence of a valid contract, the rights of plaintiff and obligations of defendant under the contract, a breach by defendant, and damages resulting from the breach." Gillis v. Principia Corporation, 832 F.3d 865, 871 (8th Cir. 2016) (quoting Lucero v. Curators of Univ. of Mo., 400 S.W.3d 1, 5 (Mo. Ct. App. 2013)). Any failure to comply with the terms of a contract constitutes a breach of the contract. Lindstrom & McKenney, Inc. v. NetSuite, Inc., No. 4:09CV1169 DDN, 2009 WL 3754155, *5 (E.D. Mo. Nov. 5, 2009) (internal citation omitted).

37. The Collateral Agreement is the only agreement between TCP and Enterprise and the parties agree it was unambiguous. The cardinal principle of contract interpretation is to ascertain the parties' intent and give effect to that intent. When a contract is unambiguous, intent "is discerned solely from the contract's language," and not from extrinsic or parole evidence of intent. CitiMortgage, Inc. v. Chicago Bancorp, Inc., 808 F.3d 747, 751 (8th Cir. 2015); see also Schnuck Markets, Inc. v. First Data Merch. Data Servs. Corp., 86 F. Supp.3d 1055, 1064 (E.D. Mo. 2015). The Court must read all of the contractual provisions as a whole and construe each

term to avoid rendering other terms meaningless. Huggins v. Fed. Exp. Corp., No. 4:06-CV-01283 SNL, 2008 WL 441727, at *6 (E.D. Mo. Feb. 14, 2008).

38.     By its terms, the Collateral Agreement was intended to facilitate TCP's purchase of JPB's assets, and specifically its equipment. See Collateral Agreement at p. 2 ("WHEREAS [JPB] has agreed to sell substantially all of its assets to TCP with the proceeds of such sale to be paid to [Enterprise] and applied to the outstanding balance under the Loan Documents until such balance is paid in full."). Upon receipt of said proceeds, Enterprise would partially release its secured lien. See id. ("WHEREAS TCP, [JBP] and Guarantors have requested that [Enterprise] agree to release its liens on certain of the Collateral pursuant to the terms of, and subject to the conditions set forth in, this Agreement.").

39.     The parties agreed to a set of conditions triggering expiration of the Collateral Agreement, including TCP's failure to obtain a commitment letter for the Equipment Purchase price on or before May 30, 2014. See Collateral Agreement at ¶¶ 8 and 17(d) (defines an event of default to include TCP's failure to perform any covenant or agreement set forth herein). TCP's admitted failure to meet this deadline was an "Event of Default" causing the Collateral Agreement to expire immediately, and any contractual obligation of Enterprise ceased to exist. Indeed, Enterprise was authorized to either dispose of, or appoint a receiver for, all of JPB's collateral (including all accounts receivable) upon the Expiration Date, further evidencing a clear intent that Enterprise had no continuing obligations under the Collateral Agreement upon expiration. See Collateral Agreement at ¶ 16(b).

40.     The Court is unpersuaded by TCP's argument that to the extent any provision of the Collateral Agreement would be subject to expiration, it was only TCP's right to be on the premises of 601 Direct and its right to the property listed on Exhibits A and B. As noted above,

the Court must construe the entire agreement in an effort to harmonize, and give effect to, all provisions of the contract so that no provision will be rendered meaningless. Huggins, 2008 WL 441727, at *6. Here, the parties' intent was to facilitate TCP's purchase of JPB's equipment. Other aspects of the Collateral Agreement were meant to keep 601 Direct operational, but nothing survives upon expiration.

41. A breach of contract action cannot be based on an expired agreement. See, e.g., Princess House, Inc. v. Linsey, 918 F. Supp. 1356, 1368 (W.D. Mo. 1994), aff'd, 77 F.3d 486 (8th Cir. 1996); Vara v. Menard, Inc., No. 1:05 CV 0551 DFH VSS, 2005 WL 2886075, at *5 (S.D. Ind. Oct. 28, 2005) ("an expired contract has by its own terms released all its parties from their respective contractual obligations"). For this reason, TCP is barred from recovery on its claim for breach of contract.

42. Further, under Missouri law, a claim for breach of the covenant of good faith and fair dealing requires an existing contract. Once a contract expires or is otherwise terminated, the duty of good faith and fair dealing lapses as well. See Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 670 (8th Cir. 2012) ("a cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim in the sense that an enforceable contract must exist before the duty of good faith and fair dealing can be implied by law into it."); Countrywide Servs. Corp. v. SIA Ins. Co., 235 F.3d 390, 393 (8th Cir. 2000) (applying Missouri law) (holding that defendant's implied duty of good faith ended at the point at which its express duties ended); see also Reitz v. Nationstar Mortg., LLC, 954 F. Supp. 2d 870, 892 (E.D. Mo. 2013). Enterprise's express duties under the Collateral Agreement, along with the duty to perform in good faith and fair dealing, terminated upon expiration of the Collateral Agreement.

43. TCP's breach of contract claims are further barred under the "first to breach" rule, which holds that a party to a contract cannot claim its benefit where he is the first to violate it. NTD I, LLC v. Alliant Asset Management Company, LLC, No. 4:16CV1246 ERW, 2017 WL 605324, *4 (E.D. Mo. Feb. 15, 2017) (citing R.J.S. Sec., Inc. v. Command Sec. Servs., Inc., 101 S.W.3d 1, 18 (Mo. Ct. App. 2003)). However, only a material breach may excuse the other party's performance. Id. To be material, the breach must be of a "vital provision (i.e. a material term) of the agreement[. The breach] cannot relate simply to a subordinate or incidental matter." Keith v. Thompson, No. 4:05CV2268 HEA, 2007 WL 4592130, at *3 (E.D. Mo. Dec. 26, 2007) (quoting Spencer Reed Group, Inc. v. Pickett, 163 S.W.3d 570, 573-74 (Mo. Ct. App. 2005)).

44. TCP's failure to obtain a commitment letter from its bank for the Equipment Purchase Price on or before May 30, 2014 was a material breach because it related to a vital provision and the essence of the Collateral Agreement—TCP's purchase of JPB's equipment, with the sale proceeds applied to the outstanding balance of JPB's loans with Enterprise. Under the "first to breach" rule, TCP is precluded from enforcing an agreement that it materially breached. NTD I, LLC, 2017 WL 605324, at *4.

45. Even if TCP's failure to obtain a commitment letter for the Equipment Purchase Price on or before May 30, 2014 was not a material breach, TCP's breach of contract claim based on Paragraph 6 of the Collateral Agreement fails because, as discussed below, there is insufficient evidence of "TCP-funded work."

46. A party claiming damages for breach of contract bears the burden of proving the existence and amount of damages with reasonable certainty. Manors at Vill. Green Condo., Inc. v. Webb, 341 S.W.3d 162, 164 (Mo. Ct. App. 2011) (citing Delgado v. Mitchell, 55 S.W.3d 508, 511–12 (Mo. Ct. App. 2001)). An award of damages must be supported by competent and

substantial evidence. Id. at 165 (internal citations omitted). Here, TCP has failed to submit sufficient evidence to prove its damages with reasonable certainty as an element of its contract claims.

47. TCP contends Enterprise breached the Collateral Agreement by misappropriating proceeds of "TCP-funded work." The Court concludes there was insufficient evidence of TCP-funded work. The invoices submitted by TCP do not qualify as business records because TCP failed to satisfy the foundational elements of Fed. R. Evid. 803(6)[2] ("records of "regularly conducted activity"). There was no testimony that the invoices were prepared by a person "with knowledge" of the matters recorded in the regular course of business or that the invoices were created as a "regularly conducted business activity" of TCP. Moreover, the invoices are not substantive evidence of TCP accounts receivable as they reference 601 Direct purchase orders and 601 Direct salespersons and describe work performed at 601 Direct with its equipment and employees. Thus, there are no TCP business records to establish the amount of "TCP-funded work" generated at the 601 Direct facility in May 2014. Newton v. Ryder Transp. Servs., 206 F.3d 772 (8th Cir. 2000) (It is the trial court's prerogative to decide whether the necessary factual foundation for the admissibility of evidence has been laid.); Fed. R. Evid. 104(a).

48. Further, there was an insufficient foundation laid for Nicholas Bozzi's opinions and methodology. See Penney v. Praxair, Inc., 116 F.3d 330, 333 (8th Cir. 1997) (Expert testimony cannot be submitted unless it is accompanied by a sufficient factual foundation.).

---

[2] The five foundational elements of Rule 803(6) are: (i) that the document have been made "at or near" the time of the matters recorded therein; (ii) that the document have been prepared by, or from information transmitted by, a person "with knowledge" of the matters recorded; (iii) that the person or persons who prepared the document have been engaged, in preparing it, in some undertaking, enterprise or business which can fairly be termed a "regularly conducted business activity;" (iv) that it have been the "regular practice" of that business activity to make documents of that nature; and (v), that the document have been retained and kept "in the course of" that or some other "regularly conducted business activity." White Industries, Inc. v. Cessna Aircraft Co., 611 F. Supp. 1049, 1059 (W.D. Mo. 1985)

Bozzi merely assumes the existence of TCP-funded work without supporting evidence thereof. He admittedly has no first-hand knowledge of 601 Direct's operations and expenditures, and his reports are based on bank documents and internal bank communications, including emails and handwritten meeting notes, which were not authenticated and thus lack foundation. No business records were ever introduced to establish TCP's costs associated with any specific print job produced at 601 Direct's facility.

49. In particular, TCP did not lay a sufficient foundation for Mr. Bozzi's opinion as to how 601 Direct's bank statements and deposit slips established proof of "TCP Funded Work." Any funds Enterprise received from JPB to pay down its loan balance came through JPB's deposit account containing funds from multiple sources, including equipment liquidation proceeds and customer payments. There was also no foundation for Mr. Bozzi's opinion that the funds Enterprise swept from 601 Direct's account was greater than what it was entitled to under the terms of the loan documents and Collateral Agreement based on a comparison of the loan balances as of the date of the December 2014 settlement agreement between Enterprise and JPB and the accounts receivable balance of 601 Direct as of the date the Collateral Agreement was signed on May 22, 2014.

50. Mr. Bozzi is not qualified to opine on the loss of TCP's going-concern value. Although he has extensive experience in the commercial printing industry, Mr. Bozzi is not a certified public accountant, forensic accountant or business valuation expert.

51. Given that the parties entered into the Collateral Agreement acknowledging the contemplated purchase of JPB's assets, TCP's failure to close on the purchase was a material breach of the Agreement, triggering the expiration of the Agreement. Upon expiration, Enterprise's express duties under the Agreement, together with the duty to perform in good faith

and fair dealing, terminated. Accordingly, judgment will be entered in favor of Enterprise on Counts I and II of TCP's complaint.

**Conversion (Count III)**

52.     Under Missouri law, conversion is "the unauthorized assumption and exercise of ownership rights over the … property of another party to the exclusion of the owner's rights." Mueller v. Barton, No. 4:13CV2523 CAS, 2014 WL 4546061, at *16 (E.D. Mo. Sept. 12, 2014) (citing IOS Capital, LLC v. Allied Home Mortg. Capital Corp., 150 S.W.3d 148, 152 (Mo. Ct. App. 2004)). A claim for conversion may be established in one of three ways: "(1) by showing a tortious taking, (2) a use or appropriation by the defendant indicating a claim or right in opposition to the owner, or (3) a refusal to give up possession on demand." Boswell v. Panera Bread Co., No. 4:14CV01833 AGF, 2015 WL 631259, at *3 (E.D. Mo. Feb. 12, 2015) (quoting Envirotech, Inc. v. Thomas, 259 S.W.3d 577, 592 (Mo. Ct. App. 2008)). Although conversion "generally is not a proper [legal] theory where the claim involves money, as opposed to a specific chattel," Mueller, 2014 WL 4546061, at *16 (quoting Johnson v. GMAC Mortg. Corp., 162 S.W.3d 110, 125 (Mo. Ct. App. 2005)), specific checks, drafts or notes will support a cause of action for conversion where they can be specifically identified. Capitol Indem. Corp. v. Citizens Nat. Bank of Fort Scott, N.A., 8 S.W.3d 893, 900 (Mo. Ct. App. 2000).

53.     For its conversion claim, TCP contends Enterprise appropriated all proceeds from TCP-funded work for the period between May 11 and May 30, 2014, depositing those proceeds into its cash account and applying them to JPB's outstanding loan balance, thereby depriving TCP of the right to possession. TCP contends the funds Enterprise allegedly converted can be specifically identified by attributing them to the invoices at issue.

54. As discussed above, TCP failed to submit proper evidence to specifically identify the proceeds at issue. There was no admissible evidence to trace the source of funds at issue. Any disputed accounts receivable proceeds, to the extent collected, were deposited into JPB's deposit account and commingled with other funds therein, including proceeds from JPB's liquidation of its equipment and undisputed accounts receivable, before being used to pay down its outstanding loans. Once commingled, the disputed proceeds were no longer specific chattel subject to conversion. See, e.g., Dwyer v. Unit Power, Inc., 965 S.W.2d 301, 306 (Mo. Ct. App. 1998) (Corporate officers' alleged diversion of checks from corporation's customers did not support claims of conversion where all funds allegedly converted had first been deposited and commingled with corporate funds in corporation's own accounts.). In light of the Court's ruling on TCP's conversion claim, there is no basis for TCP's claim for punitive damages. Judgment will therefore be entered in favor of Enterprise on Count III of TCP's complaint.

**Unjust enrichment (Count IV)**

55. TCP argues alternatively that Enterprise received a benefit in the amount of $370,000 in proceeds from TCP-funded work and was enriched by that benefit at the expense of TCP when it applied those proceeds toward payment of JPB's loans.

56. To establish a claim for unjust enrichment, a plaintiff must prove that (1) he conferred a benefit on the defendant, (2) at the expense of the plaintiff, and (3) it would be unjust to allow the defendant to retain the benefit. Federated Mut. Ins. Co. v. Peery's Auto Parts, LLC, No. 11-00172 CV-W-FJG, 2012 WL 3062720, at *2 (W.D. Mo. July 26, 2012) (citing S&J, Inc. v. McLoud & Co., 108 S.W.3d 765, 768 (Mo. Ct. App. 2003)).

57. Missouri law does not allow a plaintiff to maintain an action for unjust enrichment – an equitable claim – when an express contract governs the subject matter for which

recovery is sought. 32nd St. Surgery Ctr., LLC v. Right Choice Managed Care, 820 F.3d 950, 955–56 (8th Cir. 2016) (citing Lowe v. Hill, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014) (barring recovery under an equitable theory when there is "an express contract for the very subject matter for which [plaintiff] seeks to recover"); R & R Land Dev., L.L.C. v. Am. Freightways, Inc., 389 S.W.3d 234, 243 (Mo. Ct. App. 2012) ("[I]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract.")). In such cases, "the plaintiff's sole theory of recovery must lie on the contract." Id. (quoting Burrus v. HBE Corp., 211 S.W.3d 613, 619 (Mo. Ct. App. 2006)). There is no exception when contract claims are ultimately defeated. See Lowe, 430 S.W.3d at 349; Howard v. Turnbull, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). Here, the existence of the Collateral Agreement precludes TCP from proceeding on an unjust enrichment claim.

58.     Even if TCP could proceed on an unjust enrichment claim, the Court concludes that TCP engaged in a course of conduct that precludes it from any relief under the doctrine of unclean hands. The doctrine of "unclean hands" requires a showing that the plaintiff has acted in such a way with respect to the subject of the suit that it is precluded from obtaining an equitable remedy. Level 3 Commc'ns, LLC v. Illinois Bell Tel. Co., No. 4:13-CV-1080 (CEJ), 2017 WL 1315796, at *11 (E.D. Mo. Apr. 10, 2017) (internal quotation omitted); see also Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd., 165 S.W.3d 141, 145 (Mo. 2005). The availability of an unclean hands defense requires consideration of "all of the facts and circumstances of a particular case." Level 3 Commc'ns, 2017 WL 1315796, at *11.

59.     In this case, Greg Bozzi contends he never would have "done the deal" if, in the event of default, Enterprise was permitted to assert an interest over TCP-funded work. (Tr.

41:16-42:2). Yet he admittedly invested in JPB without the benefit of an asset purchase agreement or operating agreement, despite the fact that he has acquired failing printing companies on multiple occasions and usually has an operating agreement in place. Investing in a distressed company entails some element of risk. Companies come and go all the time; it is part of the cycle of business. Losing money as a result is part of the investment gamble. In the end, TCP knowingly made a risky investment, without the benefit of an operating agreement, which did not pan out. It gambled and lost, causing Enterprise to write off $500,000 on JPB's loans and incur an additional $100,000-$150,000 in rent, utilities, payroll, additional inventory to complete jobs in the 4-5 month period thru October (extended liquidation period). (Tr. 1 at 202:16-204:6). Accordingly, judgment will be entered in favor of Enterprise on Count IV of TCP's complaint.

## JUDGMENT

For these reasons,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment shall be entered in favor of Defendant Enterprise Bank & Trust and against TCP Printing Co., LLC, on TCP's complaint.

**IT IS FURTHER ORDERED** that Enterprise's motion for summary judgment [38] is **DENIED** as moot.

Dated this 29th day of September, 2017.

_/s/ John A. Ross_
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**